# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| GARTNER, INC., a Delaware corporation, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. ___22-1291___ |
| | ) |
| G2.COM, INC., a Delaware corporation, and | ) |
| NICHOLAS DOMINO, RICHARD | ) |
| ROLBIECKI, ANDREW BIDWELL, | ) |
| BRADLEY TOWBIN AND ERIC BACH- | ) |
| CROSBY, individuals, | ) October 13, 2022 |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff Gartner, Inc. ("Gartner") for its Complaint against Defendants G2.com, Inc. ("G2") and Nicholas Domino, Richard Rolbiecki, Andrew Bidwell, Bradley Towbin and Eric Bach-Crosby, individuals (collectively, "Defendants") states as follows:

## INTRODUCTION

1.      G2 is unfairly and deceptively targeting Gartner and poaching its employees in direct violation of Gartner employees' lawful post-employment obligations to Gartner. As part of an anti-competitive scheme and its publicly announced "hatred" of Gartner, G2 is deploying these pirated employees to deceptively prey upon Gartner's hard-earned reputation and goodwill in the industry.

2.      G2 has not been discreet about its mission to steal Gartner's market share. Godard Abel, G2's founder and Chief Executive Officer, launched G2 in 2012 with branding to suggest his company was "Gartner2." G2, who serves a wide array of IT software buyers, has used the

same fonts and colors as Gartner in an effort to create brand confusion and to leverage Gartner's reputation in the technology industry.

3.      Gartner has no affiliation or association with G2.   References to Gartner, in whatever capacity, are misleading, deceptive, and confusing.  G2 is presenting itself as "Gartner 2" or otherwise affiliating itself with Gartner in an effort to deceive the public.

4.      G2 and Abel also have publicly disparaged Gartner in an effort to mar its reputation and to usurp its premier status in the research and advisory community.

5.      More specifically, via G2's public and external-facing website and industry interviews with Abel, G2 and Abel are attempting to unfairly discredit Gartner's offerings, particularly its signature Magic Quadrant, in an effort to elevate the status of G2.

6.      In furtherance of its deceptive scheme, G2 is targeting Gartner employees to build its workforce.  G2 is unfairly benefitting from the unique and specialized training and access to confidential and proprietary information Gartner provides its employees.

7.      G2 currently employs sixteen (16) former Gartner employees, including Defendants Richard Rolbiecki, Nicholas Domino, Andrew Bidwell, Bradley Towbin and Eric Bach-Crosby (collectively referred to as "the Employees").  G2 hired seven of the sixteen former Gartner employees in the past year.

8.      The Employees joined G2 in roles substantively similar to and directly competitive with their former roles at Gartner and in direct violation of their valid and enforceable protective covenant agreements with Gartner.  For G2, the Employees will undoubtedly be utilized in the same manner in which they served Gartner, including in the development, production, marketing, and sales of the same products and/or services with which the Employees were involved while employed by Gartner.  Given the competitive nature of the two companies and the Employees'

substantively similar roles at G2, they will necessarily rely upon and utilize the confidential information and specialized training they acquired while employed by Gartner, all to G2's benefit.

9.      To further its scheme, G2 induced the Employees to breach their post-employment commitments to Gartner by hiring them in violation of their non-competition obligations.  Through this conduct, G2 continues its attempts to unfairly compete with Gartner in a competitive and specialized marketplace, to Gartner's significant detriment.  Defendants' unlawful actions must be enjoined before they can cause further harm to Gartner's legitimate business interests, including its trade secrets, proprietary and confidential information, and client and employee relationships.

## PARTIES

10.      Gartner, Inc. is a Delaware corporation with its principal place of business located at 56 Top Gallant Road, Stamford, Connecticut 06902.

11.      G2 is a Delaware corporation.  G2 lists its Registered Agent as located at 801 Adlai Stevenson Drive, Springfield, IL 62703.

12.      Nicholas Domino is a former Gartner employee.  Upon information and belief, Domino resides in Texas.  At all times relevant to this Complaint, Domino performed work for Gartner in Connecticut.  During his Gartner tenure, Domino regularly worked with Gartner's Group Vice President, Vendor Products & Central Services for Gartner Digital Marketing ("GDM") and Gartner's Senior Data Engineer for GDM, both of whom are located in Connecticut.

13.      Andrew Bidwell is a former Gartner employee.  Upon information and belief, Bidwell resides in Colorado.  At all times relevant to this Complaint, Bidwell performed work for Gartner in Connecticut.  During his Gartner tenure, Bidwell reported to at least one Gartner executive located in Connecticut.

14.     Eric Bach-Crosby is a former Gartner employee.  Upon information and belief, Bach-Crosby resides in Florida.  At all times relevant to this Complaint, Bach-Crosby performed work for Gartner in Connecticut.  During his Gartner tenure, Bach-Crosby reported to at least one Gartner executive located in Connecticut.

15.     Bradley Towbin is a former Gartner employee.  Upon information and belief, Towbin resides in Florida.  At all times relevant to this Complaint, Towbin performed work for Gartner in Connecticut.  During his Gartner tenure, Towbin reported to at least one Gartner executive located in Connecticut.

16.     Richard Rolbiecki is a former Gartner employee.  Upon information and belief, Rolbiecki resides in Florida.  At all times relevant to this Complaint, Rolbiecki performed work for Gartner in Connecticut.  During his Gartner tenure, Rolbiecki reported to at least one Gartner executive located in Connecticut.

## JURISDICTION AND VENUE

17.     Jurisdiction is proper in this district pursuant to 28 U.S.C. §§ 1331 and 1367 because Gartner asserts claims under the Federal Defend Trade Secrets Act. 18 U.S.C. § 1836, *et seq.* and the Lanham Act for False Association and Unfair Competition, 15 U.S.C.S. § 1125, , *et seq*.

18.     Venue is proper in this district under 28 U.S.C. § 1391(b)(3) because, pursuant to the Employees' employment agreements with Gartner, Gartner and the Employees consented to the exclusive jurisdiction of the federal and state courts of Connecticut in the event of a breach or threatened breach of such agreement, and because G2 has tortiously interfered with a contract governed by Connecticut law.

## GENERAL ALLEGATIONS

### Gartner's Business

19.     Gartner is a global research and advisory firm that provides clients with indispensable and enterprise-wide insights, advice and tools to help them achieve their mission critical priorities. Gartner delivers actionable, objective insight to executives and their teams. Gartner's expert guidance and tools enable faster, smarter decisions and stronger performance on an organization's mission critical priorities.

20.     Gartner delivers its products and services globally through several distinct business segments.  Gartner's Research and Advisory business delivers independent, objective advice to leaders across an enterprise through subscription services that include on-demand access to published research content – including  Gartner's signature Magic Quadrant – data and benchmarks, and direct access to a network of research experts located around the globe.

21.     Within the Research and Advisory segment, Global Technology Sales ("GTS") sells products and services to users and providers of technology, while Global Business Sales ("GBS") sells products and services to all other functional leaders, such as human resources, supply chain, marketing, and finance.

22.     Gartner's Conferences business provides executives and teams across an organization the opportunity to learn, share and network. From Gartner's Symposium/Xpo series, to industry-leading conferences focused on specific business roles and topics, to peer-driven sessions, Gartner's offerings enable attendees to experience the best of Gartner insight and guidance.

23.     In addition, Gartner's Digital Markets business consists of three leading business-to-business software search websites — Capterra, GetApp and Software Advice. These sites

leverage user generated reviews and Gartner insights to help buyers find the right technology and services for them. This business segment also helps connect these buyers with software vendors to ensure that the buyers get the most value from their investments.

24.     Gartner distinguishes itself from its competitors based on, among other things, its talented employees and delivery of high-quality products and services which it has developed through significant time and expense.

**Domino's Employment with Gartner**

25.     Domino worked as an Associate Business Analyst for Gartner Digital Markets ("GDM").

26.     GDM helps connect buyers with software vendors to ensure that the buyers get the most value from their investments. GDM provides a variety of products to its vendor clients like Pay Per Click (PPC), Pay per Lead (PPL) as well as offerings like Buyer Intent and Buyer Discovery.

27.     In his role as an Associate Business Analyst, Gartner trained and provided Domino with highly confidential and strategic information concerning buyer discovery and buyer intent, as well as business performance metrics, levers and approach to optimize PPC and PPL, and strategic opportunities. Domino expressly acknowledged the confidential and proprietary nature of the information to which Gartner provided him access throughout his employment in his Agreement Regarding Certain Conditions of Employment, as set forth herein.

28.     As a result, Domino has intimate knowledge of GDM, its offerings, and the strategies Gartner employs to monetize and expand this business.  This information is highly valuable to a competitor who is looking to surpass Gartner and take its market share in this space.

**Towbin's Employment with Gartner**

29.     Towbin worked for Gartner as an Account Manager for Gartner's Conferences business.

30.     To prepare Towbin for his Gartner Conferences Account Manager role, Gartner required Towbin to attend and successfully complete Gartner's conferences account management training, which included in-depth programming on Gartner's conferences sales strategy and methodology, techniques, best practices, technologies, and tools, as well as how to increase business acumen, identify a client's mission critical business priorities, deliver compelling client interactions, and best align Gartner capabilities to client needs.

31.     In his role as a Gartner Conferences Account Manager, Gartner trained Towbin, and Towbin gained intimate knowledge of, and had regular access to, Gartner client and prospect information; event production, content, and marketing strategies; conference sales tools and insights used and relied upon by Gartner; client engagement and purchasing information; and other related business strategies and analyses.

**Bidwell's, Bach-Crosby's and Rolbiecki's Employments with Gartner**

32.     Bidwell, Bach-Crosby and Rolbiecki worked for Gartner as Global Technology Sales ("GTS") Account Executives.  In this role, Bidwell, Bach-Crosby and Rolbiecki focused on selling Gartner's products and services to clients and prospects, which required a deep understanding of Gartner's offerings, client and prospect priorities, and how to best position the appropriate Gartner solutions against any competitive offerings.

33.     To prepare them for their roles, Bidwell, Bach-Crosby and Rolbiecki were required to attend and successfully complete Gartner's Sales Academy, which includes in-depth programming on Gartner sales strategy and methodology, techniques, best practices, technologies,

and tools, as well as how to increase business acumen, identify a client's mission critical business priorities, deliver compelling client interactions, and best align Gartner capabilities to client needs.

34.      By virtue of their employment with Gartner, the Employees also received access and exposure to a variety of Gartner's other confidential and trade secret information, including its product and service offerings (past, present and future); client and prospect identities; client entitlements; pricing and structure of products and services; client engagement and purchasing information; and go-to-market strategies for various Gartner solutions.

**The Agreements Regarding Certain Conditions of Employment**

35.      Because Gartner highly values its products, services, strategies, processes, tools, and insights, and because Gartner provided the Employees with access to such information, the Employees each entered into an Agreement Regarding Certain Conditions of Employment (the "Agreement") to protect Gartner's trade secrets, proprietary and confidential information, and customer and employee relationships.

36.      On March 22, 2021, in connection with the start of his employment, Domino agreed to and accepted the Agreement.  *See* the Domino Agreement attached hereto as Exhibit A.

37.      On May 17, 2018, in connection with the start of his employment, Bidwell agreed to and accepted the Agreement.  *See* the Bidwell Agreement attached hereto as Exhibit B.

38.      On October 17, 2018, in connection with the start of his employment, Rolbiecki agreed to and accepted the Agreement.  *See* the Rolbiecki Agreement attached hereto as Exhibit C.

39.      On August 29, 2018, in connection with the start of his employment, Towbin agreed to and accepted the Agreement.  *See* the Towbin Agreement attached hereto as Exhibit D.

40.     On September 12, 2018, in connection with the start of his employment, Bach-Crosby agreed to and accepted the Agreement.  *See* the Bach-Crosby Agreement attached hereto as <u>Exhibit E</u> (the Domino Agreement, Bidwell Agreement, Rolbiecki Agreement, Towbin Agreement and Bach-Crosby Agreement are collectively referred to as "the Agreements").

41.     The Agreements contain, among other things, reasonable and limited post-employment confidentiality and non-disclosure, non-competition, and non-solicitation provisions.

42.     The confidentiality and non-disclosure provisions of the Domino Agreement provide, in pertinent part:

**1. <u>Non-Disclosure.</u>**

(a) The Employee acknowledges that the Company's assets include many items, such as (i) financial information, (ii) products, (iii) product and services costs, prices, profits and sales, (iv) forecasts, (v) computer programs, (vi) data bases (and the documentation and information contained therein), (vii) computer access codes and similar information, (viii) software ideas, (ix) know-how, technologies, concepts and designs, (x) research projects and all information connected with research and development efforts, (xi) records, (xii) business relationships, methods and recommendations, (xiii) client lists (including identities of clients and prospective clients, identities of individual contracts at business entities which are clients or prospective clients, client spending, preferences, business or habits), (xiv) subscription or consultant termination dates, (xv) personnel files, (xvi) competitive analyses, and (xvii) other confidential or proprietary information that has not been made available to the general public by the Company's senior management; (xviii) non-public information provided to the Company by its clients.

The Employee further acknowledges that all information related to the operation of the Company's business, including, without limitation, knowledge of the Company's assets referenced above and other tangible or intangible assets and other information obtained by the Employee in the course of employment (collectively, the "the Company's Property"), (i) are confidential and trade secrets of the Company (collectively, the "Confidential Information"), (ii) shall remain the property and trade secrets of the Company, and (iii) may be subject to trademark, trade dress, copyright or similar protections.

(b) While the Employee is employed by the Company (the "Employment") and after termination of the Employment, for any reason, the Employee agrees, (i) not to use or disclose the Confidential Information or any Confidential Information of the Company's clients, other than solely in the furtherance of the Company's

business, (ii) to take all lawful measures to prevent the unauthorized use or disclosure of the Confidential Information to any third party, (iii) to take all lawful measures to prevent unauthorized persons or entities from obtaining or using the Confidential Information, and (iv) not to take any actions which would constitute or facilitate the unauthorized use or disclosure of Confidential Information.

(c) The Employee acknowledges that all of the items comprising the Confidential Information are confidential, whether or not the Company specifically labels such information as confidential or internally restricts access to such information. The Employee also acknowledges that the Company may have separate policies in effect from time to time regarding the protection of its trade secrets. The Employee agrees to abide by these policies.

Ex. A.

43.    The confidentiality and non-disclosure provisions of the Bidwell Agreement

provide, in pertinent part:

**1. <u>Non-Disclosure.</u>**

(a) The Employee acknowledges that Gartner's assets include many items, such as (i) financial information, (ii) products, (iii) product and services costs, prices, profits and sales, (iv) forecasts, (v) computer programs, (vi) data bases (and the documentation and information contained therein), (vii) computer access codes and similar information, (viii) software ideas, (ix) know-how, technologies, concepts and designs, (x) research projects and all information connected with research and development efforts, (xi) records, (xii) business relationships, methods and recommendations, (xiii) client lists (including identities of clients and prospective clients, identities of individual contracts at business entities which are clients or prospective clients, client spending, preferences, business or habits), (xiv) subscription or consultant termination dates, (xv) personnel files, (xvi) competitive analyses, and (xvii) other confidential or proprietary information that has not been made available to the general public by Gartner's senior management; (xviii) non-public information provided to Gartner by its clients. The Employee further acknowledges that all information related to the operation of Gartner's business, including, without limitation, knowledge of Gartner's assets referenced above and other tangible or intangible assets and other information obtained by the Employee in the course of employment(collectively, the "Gartner's Property"), (i) are confidential and trade secrets of Gartner (collectively, the "Confidential Information"), (ii) shall remain the property and trade secrets of Gartner, and (iii) may be subject to trademark, trade dress, copyright or similar protections. The Employee acknowledges that any disclosure of the Confidential Information, even inadvertent disclosure, would cause irreparable and material damage to Gartner.

(b)While the Employee is employed by Gartner (the "Employment") and after termination of the Employment, for any reason, the Employee agrees, (i) not to use or disclose the Confidential Information or any Confidential Information of Gartner's clients, other than solely in the furtherance of Gartner's business, (ii) to take all lawful measures to prevent the unauthorized use or disclosure of the Confidential Information to any third party, (iii) to take all lawful measures to prevent unauthorized persons or entities from obtaining or using the Confidential Information, and (iv) not to take any actions which would constitute or facilitate the unauthorized use or disclosure of Confidential Information.

The term "unauthorized" shall mean (i) in contravention of any written policies or procedures of Gartner; (ii) otherwise inconsistent with Gartner's measures to protect its interests in its Confidential Information, (iii) in contravention of any lawful instruction or directive, either written or oral, of any employee of Gartner empowered to issue such instruction or directive; (iv) in contravention of any duty existing under law or contract.

(c) The Employee acknowledges that all of the items comprising the Confidential Information are confidential, whether or not Gartner specifically labels such information as confidential or internally restricts access to such information. The Employee also acknowledges that Gartner may have separate policies in effect from time to time regarding the protection of its trade secrets. The Employee agrees to abide by these policies.

Ex. B.

44.    The confidentiality and non-disclosure provisions of the Rolbiecki Agreement

provide, in pertinent part:

**1. <u>Non-Disclosure.</u>**

(a) The Employee acknowledges that the Company's assets include many items, such as (i) financial information, (ii) products, (iii) product and services costs, prices, profits and sales, (iv) forecasts, (v) computer programs, (vi) data bases (and the documentation and information contained therein), (vii) computer access codes and similar information, (viii) software ideas, (ix) know-how, technologies, concepts and designs, (x) research projects and all information connected with research and development efforts, (xi) records, (xii) business relationships, methods and recommendations, (xiii) client lists (including identities of clients and prospective clients, identities of individual contracts at business entities which are clients or prospective clients, client spending, preferences, business or habits), (xiv) subscription or consultant termination dates, (xv) personnel files, (xvi) competitive analyses, and (xvii) other confidential or proprietary information that has not been made available to the

general public by the Company's senior management; (xviii) non-public information provided to the Company by its clients.

The Employee further acknowledges that all information related to the operation of the Company's business, including, without limitation, knowledge of the Company's assets referenced above and other tangible or intangible assets and other information obtained by the Employee in the course of employment (collectively, the "the Company's Property"), (i) are confidential and trade secrets of the Company (collectively, the "Confidential Information"), (ii) shall remain the property and trade secrets of the Company, and (iii) may be subject to trademark, trade dress, copyright or similar protections.

(b) While the Employee is employed by the Company (the "Employment") and after termination of the Employment, for any reason, the Employee agrees, (i) not to use or disclose the Confidential Information or any Confidential Information of the Company's clients, other than solely in the furtherance of the Company's business, (ii) to take all lawful measures to prevent the unauthorized use or disclosure of the Confidential Information to any third party, (iii) to take all lawful measures to prevent unauthorized persons or entities from obtaining or using the Confidential Information, and (iv) not to take any actions which would constitute or facilitate the unauthorized use or disclosure of Confidential Information.

(c) The Employee acknowledges that all of the items comprising the Confidential Information are confidential, whether or not the Company specifically labels such information as confidential or internally restricts access to such information. The Employee also acknowledges that the Company may have separate policies in effect from time to time regarding the protection of its trade secrets. The Employee agrees to abide by these policies.

Ex. C.

45.     The confidentiality and non-disclosure provisions of the Towbin Agreement

provide, in pertinent part:

**1. Non-Disclosure.**

(a) The Employee acknowledges that the Company's assets include many items, such as (i) financial information, (ii) products, (iii) product and services costs, prices, profits and sales, (iv) forecasts, (v) computer programs, (vi) data bases (and the documentation and information contained therein), (vii) computer access codes and similar information, (viii) software ideas, (ix) know-how, technologies, concepts and designs, (x) research projects and all information connected with research and development efforts, (xi) records, (xii) business relationships, methods and recommendations, (xiii) client lists (including

identities of clients and prospective clients, identities of individual contracts at business entities which are clients or prospective clients, client spending, preferences, business or habits), (xiv) subscription or consultant termination dates, (xv) personnel files, (xvi) competitive analyses, and (xvii) other confidential or proprietary information that has not been made available to the general public by the Company's senior management; (xviii) non-public information provided to the Company by its clients.

The Employee further acknowledges that all information related to the operation of the Company's business, including, without limitation, knowledge of the Company's assets referenced above and other tangible or intangible assets and other information obtained by the Employee in the course of employment (collectively, the "the Company's Property"), (i) are confidential and trade secrets of the Company (collectively, the "Confidential Information"), (ii) shall remain the property and trade secrets of the Company, and (iii) may be subject to trademark, trade dress, copyright or similar protections.

(b) While the Employee is employed by the Company (the "Employment") and after termination of the Employment, for any reason, the Employee agrees, (i) not to use or disclose the Confidential Information or any Confidential Information of the Company's clients, other than solely in the furtherance of the Company's business, (ii) to take all lawful measures to prevent the unauthorized use or disclosure of the Confidential Information to any third party, (iii) to take all lawful measures to prevent unauthorized persons or entities from obtaining or using the Confidential Information, and (iv) not to take any actions which would constitute or facilitate the unauthorized use or disclosure of Confidential Information.

(c) The Employee acknowledges that all of the items comprising the Confidential Information are confidential, whether or not the Company specifically labels such information as confidential or internally restricts access to such information. The Employee also acknowledges that the Company may have separate policies in effect from time to time regarding the protection of its trade secrets. The Employee agrees to abide by these policies.

Ex. D.

46.     The confidentiality and non-disclosure provisions of the Bach-Crosby Agreement

provide, in pertinent part:

## 1. **Non-Disclosure.**

(a) The Employee acknowledges that the Company's assets include many items, such as (i) financial information, (ii) products, (iii) product and services costs, prices, profits and sales, (iv) forecasts, (v) computer programs, (vi) data bases

(and the documentation and information contained therein), (vii) computer access codes and similar information, (viii) software ideas, (ix) know-how, technologies, concepts and designs, (x) research projects and all information connected with research and development efforts, (xi) records, (xii) business relationships, methods and recommendations, (xiii) client lists (including identities of clients and prospective clients, identities of individual contracts at business entities which are clients or prospective clients, client spending, preferences, business or habits), (xiv) subscription or consultant termination dates, (xv) personnel files, (xvi) competitive analyses, and (xvii) other confidential or proprietary information that has not been made available to the general public by the Company's senior management; (xviii) non-public information provided to the Company by its clients.

The Employee further acknowledges that all information related to the operation of the Company's business, including, without limitation, knowledge of the Company's assets referenced above and other tangible or intangible assets and other information obtained by the Employee in the course of employment (collectively, the "Company's Property"), (i) are confidential and trade secrets of the Company (collectively, the "Confidential Information"), (ii) shall remain the property and trade secrets of the Company, and (iii) may be subject to trademark, trade dress, copyright or similar protections.

(b) While the Employee is employed by the Company (the "Employment") and after termination of the Employment, for any reason, the Employee agrees, (i) not to use or disclose the Confidential Information or any Confidential Information of the Company's clients, other than solely in the furtherance of the Company's business, (ii) to take all lawful measures to prevent the unauthorized use or disclosure of the Confidential Information to any third party, (iii) to take all lawful measures to prevent unauthorized persons or entities from obtaining or using the Confidential Information, and (iv) not to take any actions which would constitute or facilitate the unauthorized use or disclosure of Confidential Information.

(c) The Employee acknowledges that all of the items comprising the Confidential Information are confidential, whether or not the Company specifically labels such information as confidential or internally restricts access to such information. The Employee also acknowledges that the Company may have separate policies in effect from time to time regarding the protection of its trade secrets. The Employee agrees to abide by these policies.

Ex. E.

47.     The Domino Agreement's non-competition provision provides, in pertinent part:

**6. (b) <u>Non-Competition</u>.**

The Employee agrees that, for a period of one (1) year following the termination of his or her Employment with the Company, for any reason whatsoever, the Employee will not, on his or her own behalf or on behalf of any other person or entity (whether as a consultant, analyst, sales person, independent contractor, independent business venturer, partner, member, employee or otherwise), directly or indirectly:

(i) Engage in any Competitive Acts; and/or

(ii) Entice, encourage, cause or invite any of the Company's clients, known prospects, and vendors to discontinue, diminish, or otherwise adversely modify the business done with the Company, or otherwise interfere with the relationship between the Company and its clients, known prospects, and vendors.

Ex. A.

48.     Section 6(a)(i) of the Domino Agreement defines "Competitive Acts" as the

following:

(A) the development, production, marketing or selling of (or assisting others to develop, produce, market or sell): (x) syndicated research that competes with Gartner or its subsidiaries; or (y) a product or service which is competitive with the existing or planned products or services of the Company with which Employee was involved in or managed at any time during the last twenty-four (24) months of the Employment; and (B) the direct or indirect provision of services to, or solicitation of, the Company's clients or known prospects with whom Employee had contact, managed, or became aware of as a result of being employed by the Company, for the purposes of developing, producing, marketing or selling such competitive products or services.

(ii) Employee understands and agrees that the Company's business is global in nature and that its clients are located throughout the world; therefore, a territorial limitation on the noncompetition covenants set forth in this Section 6 would not allow the Company to adequately protect its legitimate business interests, and the absence of such a limitation is entirely reasonable under these circumstances. In addition, Employee agrees that the provisions of Section 6 of this Agreement are reasonable to protect and preserve the Company's legitimate business interests, including the protection of the Company's Confidential Information and the Company's substantial investment made to develop and retain its Confidential Information, client base, accounts and related goodwill.

Ex. A.

49.     The Bidwell Agreement's non-competition provision provides, in pertinent part:

**6. (b) <u>Non-Competition.</u>**

The Employee agrees that, for a period of one (1) year following the termination of his or her Employment with Gartner, for any reason whatsoever, the Employee will not, on his or her own behalf or on behalf of any other person or entity (whether as a consultant, analyst, sales person, independent contractor, independent business venturer, partner, member, employee or otherwise), directly or indirectly:

(i) Engage in any Competitive Acts; and/or

(ii) Entice, encourage, cause or invite any of Gartner's clients, known prospects, and vendors to discontinue, diminish, or otherwise adversely modify the business done with Gartner, or otherwise interfere with the relationship between Gartner and its clients, known prospects, and vendors.

<u>Ex. B</u>.

50.     Section 6(a)(i) of the Bidwell Agreement defines "Competitive Acts" as the

following:

(A) the development, production, marketing or selling of – or assisting others to develop, produce, market or sell – a product or service which is competitive with the products or services of Gartner (both those existing during the Employment and those which are planned for the future and of which the Employee learns during the Employment); and (B) the solicitation, directly or indirectly, of Gartner's clients or known prospects for the purposes of developing, producing, marketing or selling such products or services.

(ii) Employee understands and agrees that Gartner's business is global in nature and that its clients are located throughout the world; therefore, a territorial limitation on the non-competition covenants set forth in this Section 6 would not allow Gartner to adequately protect its legitimate business interests, and the absence of such a limitation is entirely reasonable under these circumstances. In addition, Employee agrees that the provisions of Section 6 of this Agreement are reasonable to protect and preserve Gartner's legitimate business interests, including the protection of Gartner's Confidential Information and Gartner's substantial investment made to develop and retain its Confidential Information, client base, accounts and related goodwill.

<u>Ex. B</u>.

51.     The Rolbiecki Agreement's non-competition provision provides, in pertinent part:

**6. (b) <u>Non-Competition.</u>**

The Employee agrees that, for a period of one (1) year following the termination of his or her Employment with the Company, for any reason whatsoever, the Employee will not, on his or her own behalf or on behalf of any other person or entity (whether as a consultant, analyst, sales person, independent contractor, independent business venturer, partner, member, employee or otherwise), directly or indirectly:

(i) Engage in any Competitive Acts; and/or

(ii) Entice, encourage, cause or invite any of the Company's clients, known prospects, and vendors to discontinue, diminish, or otherwise adversely modify the business done with the Company, or otherwise interfere with the relationship between the Company and its clients, known prospects, and vendors.

Ex. C.

52.    Section 6(a)(i) of the Rolbiecki Agreement defines "Competitive Acts" as the

following:

(A) the development, production, marketing or selling of (or assisting others to develop, produce, market or sell): (x) syndicated research that competes with Gartner or its subsidiaries; or (y) a product or service which is competitive with the existing or planned products or services of the Company with which Employee was involved in or managed at any time during the last twenty-four (24) months of the Employment; and (B) the direct or indirect provision of services to, or solicitation of, the Company's clients or known prospects with whom Employee had contact, managed, or became aware of as a result of being employed by the Company, for the purposes of developing, producing, marketing or selling such competitive products or services.

(ii) Employee understands and agrees that the Company's business is global in nature and that its clients are located throughout the world; therefore, a territorial limitation on the non-competition covenants set forth in this Section 6 would not allow the Company to adequately protect its legitimate business interests, and the absence of such a limitation is entirely reasonable under these circumstances. In addition, Employee agrees that the provisions of Section 6 of this Agreement are reasonable to protect and preserve the Company's legitimate business interests, including the protection of the Company's Confidential Information and the Company's substantial investment made to develop and retain its Confidential Information, client base, accounts and related goodwill.

Ex. C.

53.    The Towbin Agreement's non-competition provision provides, in pertinent part:

**6. (b) <u>Non-Competition.</u>**

The Employee agrees that, for a period of one (1) year following the termination of his or her Employment with the Company, for any reason whatsoever, the Employee will not, on his or her own behalf or on behalf of any other person or entity (whether as a consultant, analyst, sales person, independent contractor, independent business venturer, partner, member, employee or otherwise), directly or indirectly:

(i) Engage in any Competitive Acts; and/or

(ii) Entice, encourage, cause or invite any of the Company's clients, known prospects, and vendors to discontinue, diminish, or otherwise adversely modify the business done with the Company, or otherwise interfere with the relationship between the Company and its clients, known prospects, and vendors.

<u>Ex. D</u>.

54.     Section 6(a)(i) of the Towbin Agreement defines "Competitive Acts" as the

following:

> (A) the development, production, marketing or selling of (or assisting others to develop, produce, market or sell): (x) syndicated research that competes with Gartner or its subsidiaries; or (y) a product or service which is competitive with the existing or planned products or services of the Company with which Employee was involved in or managed at any time during the last twenty-four (24) months of the Employment; and (B) the direct or indirect provision of services to, or solicitation of, the Company's clients or known prospects with whom Employee had contact, managed, or became aware of as a result of being employed by the Company, for the purposes of developing, producing, marketing or selling such competitive products or services.

> (ii) Employee understands and agrees that the Company's business is global in nature and that its clients are located throughout the world; therefore, a territorial limitation on the non-competition covenants set forth in this Section 6 would not allow the Company to adequately protect its legitimate business interests, and the absence of such a limitation is entirely reasonable under these circumstances. In addition, Employee agrees that the provisions of Section 6 of this Agreement are reasonable to protect and preserve the Company's legitimate business interests, including the protection of the Company's Confidential Information and the Company's substantial investment made to develop and retain its Confidential Information, client base, accounts and related goodwill.

<u>Ex. D</u>.

55.     The Bach-Crosby Agreement's non-competition provision provides, in pertinent

part:

**6. (b) <u>Non-Competition</u>.**

The Employee agrees that, for a period of one (1) year following the termination of his or her Employment with the Company, for any reason whatsoever, the Employee will not, on his or her own behalf or on behalf of any other person or entity (whether as a consultant, analyst, sales person, independent contractor, independent business venturer, partner, member, employee or otherwise), directly or indirectly:

(i) Engage in any Competitive Acts; and/or

(ii) Entice, encourage, cause or invite any of the Company's clients, known prospects, and vendors to discontinue, diminish, or otherwise adversely modify the business done with the Company, or otherwise interfere with the relationship between the Company and its clients, known prospects, and vendors.

<u>Ex. E</u>.

56.     Section 6(a)(i) of the Bach-Crosby Agreement defines "Competitive Acts" as the

following:

A) the development, production, marketing or selling of (or assisting others to develop, produce, market or sell): (x) syndicated research that competes with Gartner or its subsidiaries; or (y) a product or service which is competitive with the existing or planned products or services of the Company with which Employee was involved in or managed at any time during the last twenty-four (24) months of the Employment; and (B) the direct or indirect provision of services to, or solicitation of, the Company's clients or known prospects with whom Employee had contact, managed, or became aware of as a result of being employed by the Company, for the purposes of developing, producing, marketing or selling such competitive products or services.

(ii) Employee understands and agrees that the Company's business is global in nature and that its clients are located throughout the world; therefore, a territorial limitation on the non-competition covenants set forth in this Section 6 would not allow the Company to adequately protect its legitimate business interests, and the absence of such a limitation is entirely reasonable under these circumstances. In addition, Employee agrees that the provisions of Section 6 of this Agreement are reasonable to protect and preserve the Company's legitimate business interests, including the protection of the Company's Confidential Information and the

Company's substantial investment made to develop and retain its Confidential Information, client base, accounts and related goodwill.

Ex. E.

57.    The Domino Agreement's employee non-solicitation provision provides, in pertinent part:

**6. (c) <u>Non-Solicitation.</u>**

The Employee further agrees that, for a period of eighteen (18) months following the termination of his or her Employment with the Company, for any reason whatsoever, the Employee will not, directly or indirectly solicit, entice, or recruit employees of the Company to leave its employ, or offer or cause to be offered employment to any person who was employed by the Company at any time during the twelve (12) months prior to the termination of Employee's employment with the Company.

Ex. A.

58.    The Bidwell Agreement's employee non-solicitation provision provides, in pertinent part:

**6. (c) <u>Non-Solicitation.</u>**

The Employee further agrees that, for a period of two (2) years following the termination of his or her Employment with Gartner, for any reason whatsoever, the Employee will not, directly or indirectly solicit, entice, or recruit employees of Gartner to leave its employ, or offer or cause to be offered employment to any person who was employed by Gartner at any time during the eighteen (18) months prior to the termination of Employee's employment with Gartner.

Ex. B.

59.    The Rolbiecki Agreement's employee non-solicitation provision provides, in pertinent part:

**6. (c) <u>Non-Solicitation.</u>**

The Employee further agrees that, for a period of eighteen (18) months following the termination of his or her Employment with the Company, for any reason whatsoever, the Employee will not, directly or indirectly solicit, entice, or recruit employees of the Company to leave its employ, or offer or cause to be offered

employment to any person who was employed by the Company at any time during the twelve (12) months prior to the termination of Employee's employment with the Company.

Ex. C.

60.     The Towbin Agreement's employee non-solicitation provision provides, in pertinent part:

**6.  (c) <u>Non-Solicitation</u>.**

The Employee further agrees that, for a period of eighteen (18) months following the termination of his or her Employment with the Company, for any reason whatsoever, the Employee will not, directly or indirectly solicit, entice, or recruit employees of the Company to leave its employ, or offer or cause to be offered employment to any person who was employed by the Company at any time during the twelve (12) months prior to the termination of Employee's employment with the Company.

Ex. D.

61.     The Bach-Crosby Agreement's employee non-solicitation provision provides, in pertinent part:

**6. (c) <u>Non-Solicitation</u>.**

The Employee further agrees that, for a period of eighteen (18) months following the termination of his or her Employment with the Company, for any reason whatsoever, the Employee will not, directly or indirectly solicit, entice, or recruit employees of the Company to leave its employ, or offer or cause to be offered employment to any person who was employed by the Company at any time during the twelve (12) months prior to the termination of Employee's employment with the Company.

Ex. E.

62.     The Employees agreed the above provisions were "reasonable to protect and preserve the Company's legitimate business interests, including the protection of the Company's Confidential Information and the Company's substantial investment made to develop and retain

its Confidential Information, client base, accounts and related goodwill." Exs. A-F, Section 6(a)(ii).

      63.    Domino, Rolbiecki, Towbin and Bach-Crosby further acknowledged the following:

> Employee acknowledges that he or she will derive significant value from the Company's agreement to provide Employee with Confidential Information to enable Employee to optimize the performance of his or her duties to the Company. Employee also acknowledges the time, geographic and scope limitations of these obligations are fair and reasonable in all respects, and that Employee will not be precluded from gainful employment if Employee is obligated to comply with the provisions of Section 6 (a-c) of the Agreement.

Exs. A, C-F, Section 6(f).

      64.    Bidwell further acknowledged the following:

> Employee acknowledges that he or she will derive significant value from Gartner's agreement to provide Employee with Confidential Information to enable Employee to optimize the performance of his or her duties to the Company. Employee further acknowledges that fulfillment of the obligations contained in this Agreement, including, but not limited to, the obligation neither to disclose nor to use Confidential Information other than for Gartner's exclusive benefit and the obligations not to compete and not to solicit set forth above, is necessary to protect Gartner's Confidential Information and, consequently, to preserve the value and goodwill of the Company. Employee also acknowledges the time, geographic and scope limitations of these obligations are fair and reasonable in all respects, especially in light of Gartner's need to protect its Confidential Information and the international scope and nature of its business, and that Employee will not be precluded from gainful employment if Employee is obligated not to compete with Gartner or solicit its customers or others during the period and within the Territory described above.

Ex. B, Section 6(f).

      65.    The Employees also acknowledged the Agreements are "necessary and essential to protect the business, good will, and Confidential Information of the Company" and that a breach of her Agreement would "result in irreparable and continuing damage to [Gartner], for which money damages would not provide adequate relief." Exs. A-F, Section 9.

66.     The Employees also agreed to tolling provisions with respect to the enforcement of the protective covenants described above.  Specifically, the Agreements agreed that, "[i]n the event of Employee's breach or violation of this Section 6, or good faith allegation by [Gartner] of such breach or violation, the restricted periods set forth in this Section 6 shall be tolled until such breach or violation, or allegation thereof, has been duly cured or resolved, as applicable."  Exs. A-F, Section 6(f).

67.     The Agreements also provide that Gartner is entitled to its attorneys' fees and costs incurred in an action to enforce the Agreement following a breach.  Exs. A-F, Section 9.

**Gartner Protects Its Confidential Information**

68.     Gartner protected the confidential and proprietary information and trade secrets to which the Employees had access by, among other things, requiring them to attend trainings and to affirm their compliance with Gartner's Code of Conduct and other core policies.  In reliance on the Employees' affirmations, Gartner provided the Employees access to highly sensitive content that is unavailable to other Gartner employees.

69.     Additionally, Gartner requires employees with access to its confidential and proprietary information and its trade secrets to execute agreements substantially similar or identical in form to the Agreements.

**G2's Business and Targeting of Gartner in the Global IT Marketplace**

70.     Similar to Gartner, G2 is an IT advisory and consulting company serving a wide array of IT software buyers and providing strategic assessments of their clients' business models, advising on branding and positioning, and other consulting and advisory services.

71.     Like Gartner, G2 seeks to guide the technology decisions of its clients through the following:

    a.   Product reviews;

    b.   B2B marketing and sales solutions;

    c.   Consulting services;

    d.   Event management;

    e.   Training and education.

72.    G2 is incorporated in the State of Delaware and conducts business throughout the United States.

73.    G2 touts itself as "the world's largest and most trusted tech marketplace where people can discover, review, and manage the software they need to reach their potential."[1]

74.    G2's website explains its "mission is to make trust a central part of the digital transformation[] [and] [w]e give buyers better guidance than traditional analyst firms, which can take up to 2 years to update and publish technology research."[2]

75.    To achieve this mission, G2 has hired sixteen (16) former Gartner employees, seven of whom G2 hired within the past year.

76.    Not only has G2 hired sixteen (16) former Gartner employees, it has hired employees spanning a number of Gartner business units to maximize the breadth of knowledge and information it can take from Gartner.  In the past year alone, G2 hired employees from Gartner's GDM, GTS, and Conferences units, each of whom had very different roles and specialized knowledge of their respective Gartner business unit.

77.    G2 and Abel are targeting current and former Gartner employees to join G2 in order to unfairly capitalize on the specialized training and unique knowledge Gartner provides its employees to directly compete with Gartner.

---

[1] *See* https://company.g2.com/about (accessed September 23, 2022).
[2] *Id.*

78.     During the past year and a half, G2 has replaced half of its C-Level leaders with a focus on hiring leaders with enterprise and scale up experience, such as Gartner employees.

79.     To further target Gartner's clients and usurp its market share, G2 is creating a false association or affiliation with Gartner to increase its own profile and legitimacy in the industry. This is deceptive and misleading to the public and Gartner's current and prospective clients.

80.     For instance, G2 has used Gartner's signature fonts and colors to create brand confusion and publicize a false connection to and/or affiliation with Gartner.  When G2 launched its "Crowd Grid," it used the same layout, font and color schemes used by Gartner for its signature Magic Quadrant.   To this day, G2's "Crowd Grid" uses the same or similar terminology as Gartner's Magic Quadrant, only making subtle changes such as using the term "Contender" where Gartner uses the term "Challenger."

81.     Gartner has no affiliation with or connection to G2.

82.     G2 has consistently marketed itself as a competitor to Gartner and a "disrupter" of Gartner's business model.  G2's website has pages specifically devoted to Gartner to unfairly and deceptively use Gartner's name and recognition in the industry to G2's advantage and to steal market share and clients.  Such misrepresentations directly impact Gartner and its ongoing and prospective client relationships.

83.     More specifically, G2 has a page devoted to a side-by-side comparison of G2 and Gartner "to help you make the best choice between these two options, and decide which one is best for your business needs."[3]

---

[3] *See* https://www.g2.com/compare/g2-vs-gartner (accessed September 22, 2022).

84.     G2's website has another web page titled "Top 10 Gartner Alternatives & Competitors."[4]  The page "[e]xplore[s] the best alternatives to Gartner for users who need new software features or want to try different solutions . . . including G2.com . . . ."

85.     G2 and Abel also have publicly disparaged Gartner in interviews with industry insiders in an effort to usurp Gartner's market share and tarnish its reputation.

86.     For example, Abel publicly stated that his "real inspiration [for starting G2] was hating Gartner."[5]

87.     As early as 2013, Abel labeled Gartner's Magic Quadrants, one of its core product offerings, "very frustrating" and claimed G2's grid was a "more real-time, democratic, and better way to rate and recommend products."[6]

88.     Abel also has repeatedly stated he is seeking to "disrupt" Gartner and, more specifically, its signature Magic Quadrant model.[7]

89.     Abel also has characterized Gartner as out of touch with the global IT marketplace's younger demographic.[8]

90.     Most recently, in a March 8, 2022 interview, Abel explained that he and G2 "want to become a leader in one of [Gartner's] quadrants."[9]

91.     Upon information and belief, Abel also has publicly represented G2 is "going after" Gartner in the enterprise software marketplace.

---

[4] *See* https://www.g2.com/products/gartner/competitors/alternatives (accessed September 23, 2022).

[5] *See* https://www.youtube.com/watch?v=Aly3t30np_Q (accessed September 26, 2022).

[6] *See* https://www.datanami.com/2013/11/20/startup_takes_aim_at_gartner_with_crowdsourced_analytics/ (accessed September 26, 2022).

[7] *Id.; see also* https://venturebeat.com/business/chicagos-g2-crowd-a-yelp-for-business-software-raises-100-million/ (accessed September 26, 2022).

[8] *See* https://mixergy.com/interviews/bigmachines-with-godard-abel/ (accessed September 22, 2022).

[9]     *See*     https://atlantastartuppodcast.com/meet-the-founder-making-your-software-famous-godard-abel-of-g2/ (accessed September 22, 2022).

92.     G2 is publicly targeting and disparaging Gartner to increase its visibility in the industry.  G2 is maligning Gartner's name and reputation to strengthen its own credibility in the marketplace, all to Gartner's detriment.

**Domino's Employment with G2**

93.     G2 hired Domino as a Solutions Consultant, a position performing many of the same functions as his role as a Gartner Associate Business Analyst.

94.     More specifically, Gartner trained Domino as a subject matter expert on Gartner's GDM business.  Gartner also provided Domino with highly confidential and strategic information concerning buyer discovery and buyer intent, as well as business performance metrics, levers and approach to optimize PPC and PPL, and strategic opportunities.

95.     As a result, Domino has intimate knowledge of GDM, its offerings, and the strategies Gartner employs to monetize and expand this business, among other things.

96.     In his role as a G2 Solutions Consultant, a position substantially similar to his Gartner Associate Business Analyst role, Domino will draw from this experience as a GDM expert.

97.     Upon his resignation, Domino misrepresented his post-employment plans to Gartner.  More specifically, Domino told Gartner Human Resources he had not secured new employment and was contemplating his next career move.

98.     Despite Domino's assurances, Domino commenced employment at G2 almost immediately upon his resignation.

99.     Domino's last day at Gartner was May 28, 2022.

100.    Domino's expertise in, experience with and knowledge of GDM is a valuable asset to G2 and its digital marketing platform.

**Bidwell's Employment with G2**

101.    G2 hired Bidwell as a Strategic Account Executive, the same position he held as a Gartner GTS Account Executive.

102.    More specifically, in his role as a GTS Account Executive, Gartner trained Bidwell, and Bidwell gained intimate knowledge of, Gartner sales strategy and methodology, techniques, best practices, technologies, and tools, Gartner's offerings, client and prospect priorities, and how to best position the appropriate Gartner solutions against any competitive offerings.

103.    In his role as a G2 Strategic Account Executive, Bidwell will draw from this experience and knowledge as well as his experience identifying a client's mission critical business priorities, delivering compelling client interactions, and aligning Gartner capabilities to client needs.

104.    Bidwell's last day at Gartner was June 1, 2022.

105.    Bidwell's expertise in, experience with and knowledge of GTS is a valuable asset to G2 and its marketing and sales platform.

**Bach-Crosby's and Rolbiecki's Employments with G2**

106.    G2 hired Bach-Crosby and Rolbiecki as Relationship Managers, a position that is substantially the same position they held as Gartner GTS Account Executives.

107.    More specifically, in their roles as GTS Account Executives, Gartner trained Bach-Crosby and Rolbiecki, and Bach-Crosby and Rolbiecki gained intimate knowledge of, Gartner sales strategy and methodology, techniques, best practices, technologies, and tools, Gartner's offerings, client and prospect priorities, and how to best position the appropriate Gartner solutions against any competitive offerings.

108.    In their roles as G2 Relationship Managers, Bach-Crosby and Rolbiecki will draw from this experience and knowledge as well as their experience identifying a client's mission

critical business priorities, delivering compelling client interactions, and aligning Gartner capabilities to client needs.

109.    Bach-Crosby's last day at Gartner was May 20, 2022.

110.    Rolbiecki's last day at Gartner was January 4, 2022.

111.    Bach-Crosby's and Rolbiecki's expertise in, experience with and knowledge of GTS is a valuable asset to G2 and its sales and marketing platform.

**Towbin's Employment with G2**

112.    G2 hired Towbin as a Relationship Manager, a position in which he will perform many of the same functions he did in his role as an Account Manager for Gartner's Conferences business.

113.    More specifically, in his role as a Gartner Conferences Account Manager, Gartner trained Towbin, and Towbin gained intimate knowledge of, among other things, Gartner client and prospect information; event production, content, and marketing strategies; conference sales tools and insights used and relied upon by Gartner; client engagement and purchasing information; and other related business strategies and analyses.

114.    In his role as a G2 Relationship Manager, Towbin will draw from his experience and knowledge of Gartner's Conferences business, which focused on, among other things, marketing and orchestrating effective forums to provide critical guidance and advice to Gartner's clients, analyzing and compiling proprietary client information and analyzing Gartner's wealth of research products and methodologies.

115.    Towbin's last day at Gartner was December 22, 2021.

116.    Towbin's expertise in, experience with and knowledge of Gartner's Conferences business is a valuable asset to G2 and its events and trainings platform.

117.    On September 13, 2022, Gartner, through its counsel, sent the Employees and G2 letters regarding the Employees' respective post-employment contractual obligations to Gartner. *See* Letters to Employees, <u>Group Exhibit F; Letter to G2, Exhibit G</u>.  Gartner also included copies of the Employees' respective Employment Agreements in its letters.

118.    The letters to the Employees sought specific assurances from the Employees related to their post-employment obligations to Gartner.  Gartner demanded, among other things, that the Employees confirm they are not engaging in any conduct violative of their respective Agreements, including their existing employments with G2.

119.    On September 19, 2022, Domino, Bidwell, Bach-Crosby and Rolbiecki provided non-substantive responses to Gartner's letters.   Domino's, Bidwell's, Bach-Crosby's and Rolbiecki's responses failed to address Gartner's specific concerns related to their employment with G2 and the inevitable reliance on, use and disclosure of Gartner confidential information in their employment with G2, a direct Gartner competitor.

120.    Towbin did not respond to Gartner's September 13 correspondence.

121.    In its letter to G2, Gartner informed G2 of the Employees' breaches of their post-employment obligations to Gartner and demanded G2 immediately cease and desist from hiring or employing any current or former Gartner employees subject to a non-competition covenant.  The letter to G2 also demanded, in part, that G2 provide Gartner with a description of each of the Employees' duties and responsibilities at G2 to determine the nature and extent of the Employees' breaches.

122.    On September 16, 2022, G2 responded to Gartner's letter and stated the Employees' Agreements were "largely, if not entirely, unenforceable." G2 provided no legal authority or factual basis for its position.

123.    G2 failed to provide Gartner with a description of any of the Employees' duties or responsibilities at G2.

124.    G2 also refused to provide assurances that it would refrain from hiring former Gartner employees subject to lawful non-competition covenants.

125.    Because G2 and Gartner perform the same services and compete for the same client base, it will be nearly impossible for the Employees to perform their roles at G2 without utilizing the proprietary information they learned about Gartner's clients, research, and strategies.

126.    The Employees' roles at G2 also are substantively the same as the positions they held at Gartner.   The Employees are specifically engaging in the development, production, marketing or selling of (or assisting others to do so) a product or service which is competitive with the existing or planned products of Gartner which with each Employee was involved during the last twenty-four (24) months of their employment with Gartner.

127.    In marketing and selling G2's competing software products and cultivating relationships with G2's clients, the same clients for whom Gartner competes, the Employees will necessarily rely upon their extensive knowledge of Gartner's confidential, proprietary and trade secret information.

128.    In employing the Employees, G2 knew it was inducing a breach of their lawful contractual obligations to Gartner.

129.    G2 has induced the Employees' respective breaches for the purpose of harming Gartner and tarnishing its name, reputation and client relationships.

130.    G2 also lured the Employees to G2 with the promise of increased compensation.

131.    The Employees have direct knowledge of Gartner's sensitive and proprietary client information, service offerings and products (past, present and future), as well as the processes and

analyses behind those products, in addition to client and prospect identities; client entitlements; pricing and structure of products and services; client engagement and purchasing information; and go-to-market strategies for various Gartner solutions. The Employees' roles at G2 necessarily will require their reliance on and use of this proprietary information to develop and refine G2's own competitive products, tools, and services and market them to Gartner's clients and prospective clients, all to Gartner's substantial detriment.

132.    This will allow G2 to gain an unfair competitive advantage over Gartner and cause and further induce the Employees to unlawfully compete with their former employer.

133.    Gartner's business in this specialized space, including its relationships with its clients, employees, vendors, and other partners, remains at significant risk due to the Employees' continued violations of their contractual obligations to Gartner, and G2's inducement of the Employees to do so.

134.    G2's and the Employees' actions have damaged, and will continue to damage, Gartner, and must be enjoined.

135.    In particular, G2's and the Employees' actions have diminished the value of Gartner's confidential and proprietary information, harmed Gartner's relationships with its customers and employees, and damaged Gartner's goodwill, reputation, and competitive advantage.

## COUNT I
### Breach of Contract – Non-Competition
### (Injunctive Relief and Damages)
### Against the Employees

136.    Gartner realleges and incorporates by reference Paragraphs 1 through 135 as though fully set forth herein.

137.    Domino entered into the Domino Agreement with Gartner on March 22, 2021.

138.    Towbin entered into the Towbin Agreement with Gartner on August 29, 2018.

139.    Bidwell entered into the Bidwell Agreement with Gartner on May 17, 2018.

140.    Rolbiecki entered into the Rolbiecki Agreement with Gartner on October 17, 2018.

141.    Bach-Crosby entered into the Bach-Crosby Agreement with Gartner on September 12, 2018.

142.    Gartner provided the Employees with continued employment and access to and actual provision of confidential and proprietary information in exchange for their executing the Agreements.

143.    The Agreements are valid and enforceable contracts.

144.    Among other obligations under the Agreement, the Employees agreed and were obligated, for a period of one (1) year following the termination of their employments with Gartner, for any reason whatsoever, to refrain from engaging in any "Competitive Acts" (as defined within the Agreement).

145.    The Agreements generally define "Competitive Acts," in part, to include: (A) the development, production, marketing or selling of (or assisting others to develop, produce, market or sell): (x) syndicated research that competes with Gartner or its subsidiaries; or (y) a product or service which is competitive with the existing or planned products or services of the Company with which Employee was involved in or managed at any time during the last twenty-four (24) months of the Employment.

146.    The terms of the Agreements do not pose an undue hardship on the Employees.

147.    The Agreements are not injurious to the public.

148.    Gartner has fully performed its contractual obligations with the Employees under the Agreements.

149.    The terms of the Agreements are not greater than required for the protection of Gartner's legitimate business interests, including its confidential information and good will with its customers.

150.    G2 is a direct competitor of Gartner.

151.    Gartner's business includes providing clients, including senior leaders and their teams within IT, finance, sales and customer service, legal, compliance and assurance, with enterprise-wide insights, advice, and tools to help them achieve their mission critical priorities. Gartner's guidance and advice includes competitive analysis reports, industry overviews, market trend data, research notes, and product evaluation reports, and Gartner provides its clients with access to its world class teams of analysts and advisors, as well as technology management, technology selection, and consulting services.

152.    Similarly, G2 is an IT advisory and consulting company which provides business insights, business plan assessments, marketing and strategy valuations, and risk assessments within the technology industry.  Upon information and belief, G2 has publicly stated it is "going after" Gartner and seeks to disrupt Gartner's signature Magic Quadrant model so that it can provide competing services to Gartner's existing and prospective clients.

153.    At G2, the Employees are working in substantively the same roles they held at Gartner and are violating their Agreements with Gartner.

154.    Through their G2 employments, the Employees will engage in the conduct from which they agreed to refrain – namely, developing, producing, marketing, or selling products or services which are competitive with the products or services with which they were involved during their Gartner employments.

155.    Specifically, Gartner provided the Employees with specialized training and confidential and proprietary information that the Employees with rely upon and use in their G2 employments, such as:

a.      As a GDM Associate Business Analyst, Domino accessed and learned Gartner's GDM business and, more specifically, strategic information concerning buyer discovery as well as business performance metrics, levers and approaches to optimize PPC and PPL, and strategic opportunities.  As a G2 Solutions Consultant, Domino will perform many of the same functions as his role as a Gartner Associate Business Analyst.

b.      As GTS Account Executives, Bidwell, Rolbiecki and Bach-Crosby have intimate knowledge of Gartner sales strategy and methodology, techniques, best practices, technologies, and tools, Gartner's offerings, client and prospect priorities, and how to best position the appropriate Gartner solutions against any competitive offerings. Bidwell is performing the same role at G2 as a Strategic Account Executive.  Bach-Crosby and Rolbiecki are now serving as G2 Relationship Managers, a substantially similar role as a Gartner Account Executive.

c.      As a Gartner Conferences Account Manager, Towbin gained intimate knowledge of and had regular access to, Gartner client and prospect information; event production, content, and marketing strategies; conference sales tools and insights used and relied upon by Gartner; client engagement and purchasing information; and other related business strategies and analyses. Towbin is now serving as G2 Relationship Manager, a position performing many of the same functions as his role as a Gartner Conferences Account Manager.

156.    The Employees violated their Agreements by virtue of accepting employment with G2, a competitor of Gartner, to develop, produce, market or sell products or services that are competitive with the services Employees provided while at Gartner.

157.    Gartner has suffered and will continue to suffer damages as a result of the Employees' breaches of contract, including diminished value of its confidential information, damaged goodwill with customers, and loss of its competitive advantage.

158.    Gartner's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

159.    Gartner has demonstrated that the Employees, unless enjoined, will continue to engage in conduct that breaches their Agreements with Gartner.

160.    The Employees' actions will continue to harm Gartner if not enjoined.

161.    Should the Court grant injunctive relief to Gartner, the burden on the Employees would be slight compared to the injury to Gartner if injunctive relief is not granted.

162.    Further, the Employees agreed injunctive relief would be an appropriate remedy in the event they breached their Agreements.

163.    Granting an injunction will not disserve the public interest.  Indeed, injunctive relief is consistent with the Agreements between the parties.

**WHEREFORE**, Gartner prays for judgment against the Employees and requests the Court grant the following relief:

A.    Entry of a Permanent Injunction against the Employees, enjoining them consistent with the terms of the Agreements;

B.   Entry of a declaratory judgment in favor of Gartner, and against the Employees, finding that the conduct complained of is illegal and unfair and violates the Agreements between the Parties;

C.   For actual, compensatory, and exemplary damages to be determined at trial;

D.   Attorneys' fees and costs; and

E.   Such other and further relief the court deems just.

## COUNT II
### Tortious Interference with Contractual Relations
### (Injunctive Relief and Damages)
### Against G2

164.   Gartner realleges and incorporates by reference Paragraphs 1 through 163 as though fully set forth herein.

165.   The Employees signed valid and enforceable Agreements in which they promised, among other things, not to compete and not to disclose Gartner's trade secrets and confidential information.

166.   G2 hired the Employees in roles substantively similar and directly competitive with their former roles at Gartner.  G2 hired the Employees into roles which require them to breach their Agreements as their employment constitutes a "Competitive Act" as defined in the Agreements.

167.   G2 had knowledge of the Agreements and the Employees' contractual obligations to Gartner.  G2 knew that its employment of the Employees would cause them to breach their Agreements with Gartner.

168.   G2 nevertheless intentionally interfered with the contractual relationship between Gartner and the Employees by inducing them to breach their contracts by joining G2 and by disclosing trade secrets and confidential information and joining a competitive business, especially

considering the similarities and the competitive natures of the businesses and the fact the Employees were hired into substantively similar roles at G2 they previously held with Gartner.

169.    G2 hired each of the Employees into a role which will require them to engage in the development, production, marketing or selling of (or assist others to do so) a product or service which is competitive with the existing or planned products of Gartner which with each Employee was involved during the last twenty-four (24) months of their employment with Gartner.

170.    G2's intentional interference with the contractual relationship between Gartner and the Employees was improper and without justification.  G2 knew the Employees were bound by the restrictive covenants in the Agreements yet, nevertheless, improperly induced and knowingly and intentionally employed them in violation of those covenants.

171.    G2's actions were improper, unjustified, malicious, and in reckless disregard for Gartner's rights, entitling Gartner to damages. G2 induced the Employees to violate their Agreements, in furtherance of G2's plan to create and "go[] after" Gartner, a company G2's CEO and founder publicly "hate[s]," and hire former Gartner employees to build its workforce to unfairly compete with Gartner, increase its sales and generate more revenue at the expense of Gartner's business and with the help of the Employees' and others' knowledge and expertise, which the Employees only acquired by virtue of their Gartner employments.

172.    Gartner has suffered and will continue to suffer damages and irreparable harm as a direct result of G2's tortious interference with contractual relations, including diminished value of its confidential information, harm to its goodwill and reputation, and loss of its competitive advantage.

173.    Gartner's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

174.    G2's actions will continue to cause irreparable harm and damages to Gartner if not restrained.

**WHEREFORE**, Gartner prays for judgment against G2 and requests the Court grant the following relief:

A.  Entry of a Permanent Injunction against G2, enjoining it from interfering with Gartner's contractual relationships with the Employees and other Gartner employees subject to valid and enforceable post-employment obligations;

B.  For actual, compensatory, and exemplary damages to be determined at trial; and

C.  Such other and further relief the court deems as just.

**COUNT III**
**Trade Secrets Misappropriation Under the Connecticut Uniform Trade Secrets Act**
**(Injunctive Relief and Damages)**
**Against All Defendants**

175.    Gartner realleges and incorporates by reference Paragraphs 1 through 174 as though fully set forth herein.

176.    The Connecticut Uniform Trade Secrets Act, Conn. Gen. Stat. § 35-50 *et seq.*, prohibits the misappropriation of trade secrets.  Under the Act, a trade secret means "information, including a formula, pattern, compilation, program, device, method, process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Conn. Gen. Stat. § 35-51(d).

177.    Under the Act, misappropriation means any of the following: "(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret of another without express

-39-

or implied consent by a person who (A) used improper means to acquire knowledge of the trade secret; or (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was (i) derived from or through a person who had utilized improper means to acquire it; (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, including but not limited to disclosures made under section 1-210, sections 31-40j to 31-40p, inclusive, or subsection (c) of section 12-62; or (iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (C) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake." Conn. Gen. Stat. § 35-51(a).

178.    Gartner dedicated substantial time and resources towards developing business methods, research products, techniques, strategies, means of operation, client lists, compilations of sensitive and proprietary client information, and other trade secrets, all of which provide economic value and give Gartner an advantage over its competitors who have not compiled this information.  In particular, Gartner's trade secrets include its research methodologies, product and service offerings (past, present and future), client and prospect identities, client entitlements, the pricing and structure of products and services, client engagement and purchasing information and go-to-market strategies for various Gartner solutions, among other things.

179.    This information required substantial resources to develop, and it is not publicly known.  At all relevant times, Gartner has made reasonable efforts to ensure that its confidential and proprietary trade secrets remain confidential, proprietary, secret, and available for Gartner's commercial use only.  Gartner allows its employees access to this information only after they have executed confidentiality and non-competition agreements like the Employees' Agreements.

180.    The Employees had access to Gartner's confidential information and trade secrets for the clients they advised, as well as others whose information was contained in Gartner's client proposal reviews.

181.    In Bidwell's, Bach Crosby's and Rolbiecki's roles as GTS Account Executives, they had knowledge of Gartner's confidential information and trade secrets, specifically Gartner sales strategy and methodology, techniques, best practices, technologies, and tools, Gartner's offerings, client and prospect priorities, and how to best position the appropriate Gartner solutions against any competitive offerings.

182.    To prepare them for their roles, Bidwell, Bach-Crosby and Rolbiecki were required to attend and successfully complete Gartner's Sales Academy, which includes in-depth programming on Gartner sales strategy and methodology, techniques, best practices, technologies, and tools, as well as how to increase business acumen, identify a client's mission critical business priorities, deliver compelling client interactions, and best align Gartner capabilities to client needs.

183.    In his role as an Associate Business Analyst, Gartner trained Domino on, and Domino acquired intimate knowledge of, Gartner's confidential information and trade secrets, specifically GDM, its offerings, the strategies Gartner employs to monetize and expand this line of business, buyer discovery, buyer intent, as well as business performance metrics, levers and approaches to optimize PPC and PPL, and strategic opportunities.

184.    In Towbin's role as Gartner Conferences Account Manager, Towbin had knowledge of and had regular access to Gartner's confidential information and trade secrets, specifically Gartner client and prospect information; event production, content, and marketing strategies; conference sales tools and insights used and relied upon by Gartner; client engagement and purchasing information; and other related business strategies and analyses.

185.    To prepare Towbin for his Gartner Conferences Account Manager role, Gartner required Towbin to attend and successfully complete Gartner's conferences account management training, which included in-depth programming on Gartner's conferences sales strategy and methodology, techniques, best practices, technologies, and tools, as well as how to increase business acumen, identify a client's mission critical business priorities, deliver compelling client interactions, and best align Gartner capabilities to client needs.

186.    In their respective roles, the Employees had knowledge of and access to Gartner's confidential information and trade secrets.

187.    The Employees knew they had a duty to maintain the secrecy of Gartner's trade secrets due to their acknowledgement of such under the Agreements.

188.    G2 is under a duty to not accept any misappropriated trade secrets, including Gartner's trade secrets.

189.    G2 is also under a duty to not disclose or utilize misappropriated trade secrets for the purpose of gaining a competitive advantage in the industry.

190.    By virtue of their new positions with G2, a direct competitor of Gartner, and the significant overlap between their duties and responsibilities in their former positions with Gartner and their new positions with G2, the Employees have threatened to misappropriate Gartner's trade secrets to compete unfairly with Gartner on behalf of G2, including proprietary information relating to Gartner's product and service offerings (past, present and future); client and prospect identities; client entitlements; pricing and structure of products and services; client engagement and purchasing information; and go-to-market strategies for various Gartner solutions.

191.     Upon information and belief, G2 has not taken any actions to prevent the Employees from using or disclosing Gartner's trade secrets, and any such actions would be ineffectual.

192.     Upon information and belief, G2 hired the Employees in order to benefit from their knowledge of Gartner's trade secret, proprietary, and confidential information.

193.     In light of the similarities between the Employees' roles at Gartner and G2, and the fact that the companies are direct competitors, the Employees will necessarily disclose or continue to disclose and utilize Gartner's trade secrets in the course of their employments with G2.

194.     Gartner has suffered and will continue to suffer damages and irreparable harm as a result of this misappropriation, including harm to its reputation, good will, customer relationships, and its competitive advantage.

195.     Gartner has no adequate remedy at law for such present and future harm and therefore, is entitled to equitable relief in addition to compensatory relief.

196.     Defendants' actions will continue to cause irreparable harm and damages to Gartner if not enjoined.

197.     Additionally, because Defendants have committed the acts alleged herein willfully, in bad faith, from an improper motive amounting to malice, and in conscious disregard of Gartner's rights, Gartner is entitled to recover punitive damages from Defendants, in an amount according to proof at trial.

**WHEREFORE**, Gartner prays for judgment against Defendants, jointly and severally, and requests the Court grant the following relief:

A. Entry of a Permanent Injunction against the Employees and G2, enjoining them from using, referencing, or disclosing Gartner's trade secrets under the Connecticut Uniform Trade Secrets Act, and any other applicable relief;

B. For actual, compensatory, and exemplary damages to be determined at trial;

C. For attorneys' fees in accordance with the Connecticut Uniform Trade Secrets Act; and

D. Such other and further relief the court deems just.

## COUNT IV
### Trade Secrets Misappropriation Under the Defend Trade Secrets Act
### (Injunctive Relief and Damages)
### Against All Defendants

198. Gartner realleges and incorporates by reference Paragraphs 1 through 197 as though fully set forth herein.

199. The Defend Trade Secrets Act ("DTSA") of 2016, Pub. L. No. 114-153, 130 Stat. 376, which was passed into law on May 11, 2016 and amends chapter 90 of Title 18 of the U.S. Code, forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

200. Under the DTSA, "trade secret" means "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally

known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

201. Under the DTSA, "misappropriation" means "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired by accident or mistake." 18 U.S.C. § 1839(5).

202. Under the DTSA, "improper means" "(A) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6).

203. Gartner dedicated substantial time and resources towards developing business methods, techniques, strategies, means of operation, customer lists, and other trade secrets that provide economic value and give Gartner an advantage over its competitors who have not compiled this information. In particular, Gartner's trade secrets include its research methodologies, product and service offerings (past, present and future), sales enablement

techniques, methods for setting research priorities and agendas, client and prospect identities, client entitlements, the pricing and structure of products and services, client engagement and purchasing information; and go-to-market strategies for various Gartner solutions, among other things.

204.    This information required substantial resources to develop, and it is not publicly known.  At all relevant times, Gartner has made reasonable efforts to ensure that its confidential and proprietary trade secrets remain confidential, proprietary, secret, and available for Gartner's commercial use only.  Gartner allows its employees access to this information only after they have executed confidentiality and non-competition agreements like the Agreements the Employees executed.

205.    After executing the Agreements, the Employees had access to Gartner's confidential information and trade secrets for the customer relationships which they were responsible for developing and maintaining on behalf of Gartner, so that they could perform their jobs and increase customer good will on behalf of Gartner.

206.    In Bidwell's, Bach Crosby's and Rolbiecki's roles as GTS Account Executives, they had knowledge of Gartner's confidential information and trade secrets, specifically Gartner sales strategy and methodology, techniques, best practices, technologies, and tools, Gartner's offerings, client and prospect priorities, and how to best position the appropriate Gartner solutions against any competitive offerings.

207.    To prepare them for their roles, Bidwell, Bach-Crosby and Rolbiecki were required to attend and successfully complete Gartner's Sales Academy, which includes in-depth programming on Gartner sales strategy and methodology, techniques, best practices, technologies,

and tools, as well as how to increase business acumen, identify a client's mission critical business priorities, deliver compelling client interactions, and best align Gartner capabilities to client needs.

208.     In his role as an Associate Business Analyst, Gartner trained Domino on, and Domino acquired intimate knowledge of, Gartner's confidential information and trade secrets, specifically GDM, its offerings, the strategies Gartner employs to monetize and expand this line of business, buyer discovery, buyer intent, as well as business performance metrics, levers and approaches to optimize PPC and PPL, and strategic opportunities.

209.     In Towbin's role as Gartner Conferences Account Manager, Towbin had knowledge of and had regular access to Gartner client and prospect information; event production, content, and marketing strategies; conference sales tools and insights used and relied upon by Gartner; client engagement and purchasing information; and other related business strategies and analyses.

210.     To prepare Towbin for his Gartner Conferences Account Manager role, Gartner required Towbin to attend and successfully complete Gartner's conferences account management training, which included in-depth programming on Gartner's conferences sales strategy and methodology, techniques, best practices, technologies, and tools, as well as how to increase business acumen, identify a client's mission critical business priorities, deliver compelling client interactions, and best align Gartner capabilities to client needs.

211.     The Employees knew they had a duty to maintain the secrecy of Gartner's trade secrets due to their acknowledgements of such under the Agreements.

212.     G2 is under a duty to not accept any misappropriated trade secrets, including Gartner's trade secrets.

213.    G2 is also under a duty to not disclose or utilize misappropriated trade secrets for the purpose of gaining a competitive advantage in the industry.

214.    By virtue of their new positions with G2, a direct competitor of Gartner, and the significant overlap between their duties and responsibilities in their former positions with Gartner and their new positions with G2, the Employees have threatened to misappropriate Gartner's trade secrets to compete unfairly with Gartner on behalf of G2, including proprietary information relating to the research process and methodologies Gartner utilizes to advise sales leaders on tools and products, services, and market trends.

215.    Upon information and belief, G2 has not taken any actions to prevent the Employees from using or disclosing Gartner's trade secrets, and any such actions would be ineffectual.

216.    Upon information and belief, G2 hired the Employees in order to benefit from their knowledge of Gartner's trade secret, proprietary, and confidential information.

217.    In light of the similarities between the Employees' roles at Gartner and G2, and the fact that the companies are direct competitors, the Employees will necessarily disclose or continue to disclose and utilize Gartner's trade secrets in the course of their employments with G2.

218.    Defendants' actions constitute misappropriation, or at the very least threatened misappropriation, in violation of the Defend Trade Secrets Act.

219.    Gartner has suffered and will continue to suffer damages and irreparable harm as a result of this misappropriation, including harm to its reputation, good will, customer relationships, and its competitive advantage.

220.    Gartner has no adequate remedy at law for such present and future harm, and therefore is entitled to equitable relief in addition to compensatory relief.

221.    Defendants' actions will continue to cause irreparable harm and damages to Gartner if not enjoined.

222.    Additionally, because Defendants have committed the acts alleged herein willfully, in bad faith, from an improper motive amounting to malice, and in conscious disregard of Gartner's rights, Gartner is entitled to recover punitive damages from Defendants, in an amount according to proof at trial.

**WHEREFORE**, Gartner prays for judgment against Defendants, jointly and severally, and requests the Court grant the following relief:

A.    Entry of a Permanent Injunction against the Employees and G2, enjoining them from using, referencing, or disclosing Gartner's trade secrets under the Defend Trade Secrets Act, and any other applicable relief;

B.    For actual, compensatory, and exemplary damages to be determined at trial;

C.    For attorneys' fees in accordance with the Defend Trade Secrets Act; and

D.    Such other and further relief the court deems just.

**COUNT V**
**Violation of the Connecticut Unfair Trade Practices Act**
**(Injunctive Relief and Damages)**
**Against G2**

223.    Gartner realleges and incorporates by reference Paragraphs 1 through 222 as though fully set forth herein.

224.    G2 has engaged in a deceptive campaign to mislead and confuse the public and Gartner's current and prospective clients.

225.    G2 launched in 2012 with branding as "Gartner2."

226.     G2 uses the same fonts and colors as Gartner in an effort to create brand confusion and to publicize a false connection to and/or affiliation with Gartner through repeated, and unauthorized, use of Gartner's name, branding and likeness.

227.     G2's website has pages specifically devoted to Gartner to unfairly and deceptively use Gartner's name and recognition in the industry to its advantage and to confuse and mislead the public.

228.     G2's website repeatedly references Gartner and also publicizes a false connection to and/or affiliation with Gartner through repeated, and unauthorized, use of Gartner's name, branding and likeness.

229.     Additionally, when G2 launched its "Crowd Grid," it used the same layout, font and color schemes used by Gartner for its signature Magic Quadrant.  To this day, G2's "Crowd Grid" uses the same or similar terminology as Gartner's Magic Quadrant, only making subtle changes such as using the term "Contender" where Gartner uses the term "Challenger."

230.     Gartner has no affiliation with or connection to G2.  G2's misrepresentations to the contrary are unethical and unscrupulous.

231.     G2 is unfairly and deceptively using Gartner's name, branding and likeness and recognition in the industry to its advantage to confuse and mislead the public.   Such misrepresentations directly impact Gartner and its ongoing and prospective client relationships.

232.     G2 is also misrepresenting its connection to or affiliation with Gartner to increase its visibility in the industry.  G2 is leveraging Gartner's name and reputation to publicly strengthen its own credibility in the market place, all to Gartner's detriment.

233.     G2 is also targeting Gartner employees to further its unfair and deceptive scheme and currently employs at least sixteen (16) former Gartner employees.

234.   G2's unfair methods of competition and its unfair and deceptive acts have a direct effect on the general consuming public.

235.   G2's unfair and deceptive acts have and will continue to harm Gartner and its current and prospective client relationships if not enjoined.

**WHEREFORE**, Gartner prays for judgment against G2 and requests the Court grant the following relief:

A.  Entry of a Permanent Injunction against G2, enjoining it from improperly using Gartner's name in its internal and external marketing, promotional, operational, and other business materials, and any other applicable relief;

B.  For actual, compensatory, exemplary and punitive damages to be determined at trial; and

C.  Such other and further relief the court deems as just.

## COUNT VI
### Violation of the Lanham Act for False Association and Unfair Competition
### 15 U.S.C. § 1125
### (Injunctive Relief and Damages)
### Against G2

236.   Gartner realleges and incorporates by reference Paragraphs 1 through 235 as though fully set forth herein.

237.   G2's repeated use of Gartner's name on its website and other marketing materials, is calculated to, has caused, and is likely to cause confusion and deception.

238.   G2 launched in 2012 with branding as "Gartner2."

239.   G2 uses the same fonts and colors as Gartner in an effort to create brand confusion and to deceive as to the affiliation, connection, or association between Gartner and G2.

240.    G2's website and other public-facing marketing and promotional materials publicize a false connection to and/or affiliation with Gartner through repeated, and unauthorized, use of Gartner's name, branding and likeness.

241.    Additionally, when G2 launched its "Crowd Grid," it used the same layout, font and color schemes used by Gartner for its signature Magic Quadrant.  To this day, G2's "Crowd Grid" uses the same or similar terminology as Gartner's Magic Quadrant, only making subtle changes such as using the term "Contender" where Gartner uses the term "Challenger."

242.    G2's website has pages specifically devoted to Gartner to unfairly and deceptively use Gartner's name and recognition in the industry and to cause confusion and to deceive as to the affiliation, connection, or association between Gartner and G2.

243.    As a consequence of G2's misuse of Gartner's name on its website and Gartner's branding and likeness, the public and Gartner's current and prospective clients are likely to believe that G2 and its services are affiliated, associated, or connected with Gartner.

244.    G2 intentionally developed its branding, name and website to be confusing and deceptive regarding a purported affiliation, association, or connection with Gartner.

245.    G2 hired sixteen (16) former Gartner employees to further its confusing and deceptive scheme to unfairly compete with Gartner and mislead the public and Gartner's current and prospective clients.

246.    Gartner has no affiliation with or connection to G2.  G2's misrepresentations to the contrary are unethical and unscrupulous.

247.    G2, through its acts set forth above, has made and will continue to make profits to which it is not in equity or good conscience entitled.

248.     G2's wrongful acts and unauthorized use of Gartner's name, branding and likeness has and will continue to cause Gartner substantial injury, including loss of clients, dilution of its reputation, dilution of its good will, confusion of its existing and potential customers, loss of reputation, and diminution of its confidential, proprietary and trade secret information.

249.     By reason of G2's intentional and willful conduct, Gartner has been and will continue to be irreparably harmed unless G2 is permanently enjoined from its wrongful conduct.

250.     Gartner is entitled to recover from G2 all damages it has sustained and will sustain, and all gains, profits and advantages obtained by G2 as a result of its unlawful acts, in an amount to be determined at trial.

**WHEREFORE**, Gartner prays for judgment against G2 and requests the Court grant the following relief:

A. Entry of a Permanent Injunction against G2, enjoining it from improperly using Gartner's name in its internal and external marketing, promotional, operational, and other business materials, and any other applicable relief;

B. For actual, compensatory, exemplary and treble damages to be determined at trial; and

C.   Such other and further relief the court deems as just.

## PRAYER FOR RELIEF

With respect to this Complaint, and based on the foregoing, Plaintiff Gartner, Inc. prays for the following relief:

1. Entry of a Permanent Injunction against the Employees enjoining them from using or disclosing Gartner's trade secrets and proprietary and confidential information, and from committing further violations of their non-competition or non-solicitation obligations to

Gartner, for the full term of such restrictions, as contemplated by the Agreements' tolling provisions;

2.  Entry of a Permanent Injunction against G2, enjoining it from further interfering with Gartner's contractual relationships with its employees and from using Gartner's trade secrets and proprietary and confidential information;

3.  Entry of a Permanent Injunction against G2, enjoining it from improperly using Gartner's name in its internal and external marketing, promotional, operational, and other business materials;

4.  Entry of a Permanent Injunction against the Employees and G2, enjoining them from using, referencing, or disclosing Gartner's trade secrets under the Connecticut Uniform Trade Secrets Act;

5.  Entry of a Permanent Injunction against the Employees and G2, enjoining them from using, referencing, or disclosing Gartner's trade secrets under the Defend Trade Secrets Act;

6.  For actual, compensatory, treble, punitive and exemplary damages to be determined at trial;

7.  Attorneys' fees and costs; and

8.  Such other and further relief the court deems as just.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Gartner, Inc. hereby asserts its right to a trial by jury on all counts so triable.

Dated:  October 13, 2022

Respectfully submitted,

GARTNER, INC.

By:  */s Christopher Collins*
Bar No.: CT29869
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 653-8700
Fax: (212) 653-8701

Kevin M. Cloutier, Esq.
(*pro hac vice* admission pending)
Illinois Bar No.: 6273805
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
321 North Clark Street, 32nd Floor
Chicago, Illinois 60654
Tel: (312) 499-6300
Fax: (312) 499-6301
kcloutier@sheppardmullin.com

*Counsel for Plaintiff Gartner, Inc.*